## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

AMIE OLSCHAFSKIE, Executrix of
ESTATE OF TYLER DAMATO and AMIE
OLSCHAFSKIE, individually,
     Plaintiffs,

     v.

TOWN OF ENFIELD, et al.,
     Defendants.

No. 3:15–cv–67 (MPS)

## RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Amy Olschafskie, individually and as executrix of the estate of her son Tyler D'Amato, brings this action against the Town of Enfield, the Enfield Police Department, Police Chief Carl Sferrazza, Officer Matthew Worden, Officer Jamie Yott, and two unnamed officers. Olschafskie's claims arise out of her allegations that the officer defendants used excessive force when they arrived at her home in December 2012 to transport D'Amato to the hospital, allegedly forcing him to the ground, hitting his head against asphalt, and tasing him. (ECF No. 1-1 at ¶¶ 17–35.) I previously granted the defendants' motion to dismiss the claims against the officer defendants in their official capacities, and the plaintiff withdrew her claims against the Enfield Police Department. (ECF No. 62.)

After discovery, the Town of Enfield, Chief Carl Sferrazza, and Officer Jaimie Yott move for summary judgment on all claims remaining against them. (Motion for Partial Summary Judgment, ECF No. 89.) Defendant Officer Worden moves for partial summary judgment on claims three (negligence), six (negligent infliction of emotional distress), eight (failure to intervene under § 1983), nine (failure to intervene under state law), eleven (wrongful death), and thirteen

(bystander emotional distress). (ECF Nos. 90, 91.) For the reasons discussed below, the motions for summary judgment are GRANTED in part and DENIED in part.

## I.    Background

The following facts, taken from the parties' Local Rule 56(a) Statements (ECF Nos. 89-2, 96), affidavits, and exhibits, are undisputed unless otherwise noted. Additional facts are discussed in the analysis where relevant.

Tyler D'Amato was Amie Olschafskie's son. (ECF No. 95-1 at 5.) He was twenty years old. (*Id.*) On August 26, 2012, D'Amato's cousin died. (*Id.* at 21.) Following this death, D'Amato experienced symptoms of depression, although Olschafskie stated that these symptoms were mitigated by December 2012. (*Id.*) On October 25, 2012, after an argument, the son of D'Amato's father's girlfriend hit D'Amato with a car. (*Id.* at 13–14.) Because of this accident, D'Amato suffered a traumatic brain injury. (*Id.* at 16–17, ECF No. 95-19.) The brain injury caused D'Amato to suffer from dizziness, headaches, problems with vision, short term memory problems, and mood swings (e.g., feeling "down" as well as "combative") and to walk with a cane. (ECF No. 95-1 at 16–22.) He was treated for this injury at both St. Francis Hospital and the Mount Sinai Traumatic Brain Injury Clinic. (*Id.* at 19, ECF No. 95-19.) According to Olschafskie, D'Amato's symptoms from this injury had mostly dissipated by late December 2012. (ECF No. 89-2 at 21.)

On December 25, 2012, D'Amato told Olschafskie that he was upset at the thought of spending Christmas without his cousin. (ECF No. 95-1 at 27.) He went to his girlfriend's house for a few hours during the day, but eventually her father asked him to leave. (*Id.* at 29.) Olschafskie's mother picked D'Amato up. (*Id.* 29–30.) They stopped at a gas station. (*Id.*) D'Amato got out of the car and refused to get back in. (*Id.*) Olschafskie's mother was concerned about D'Amato; she returned to Olschafskie's house and relayed her concerns to Olschafskie. (*Id.*

at 30–31.) After that, D'Amato called Olschafskie and told her that he was walking in the road, near traffic. (ECF No. 95-1 at 31–34.) Olschafskie grew worried that D'Amato was suicidal after her phone conversations with him. (*Id.* at 34–35.) Olschafskie's friend, Matthew Orefice, went to pick up D'Amato and brought him back to Olschafskie's house. (*Id.* at 33.)

In the meantime, Olschafskie's mother went to the Enfield Police Department ("EPD") to request police assistance in hospitalizing D'Amato for emergency psychological evaluation. (ECF Nos. 89-2 at ¶1, 95-1 at 35–36, 96 at ¶ 1.) The EPD dispatched Officers Peterson, Taylor, and Worden to Olschafskie's house. (ECF Nos. 89-2 at ¶ 4; 96 at ¶ 4.) On their way, the sergeant with whom plaintiff's mother spoke called the officers to advise them that D'Amato walked with a cane and suffered from a brain injury. (*Id.*) Plaintiff and defendants agree that "Officer Yott was not present for, did not witness, and did not participate in any use of force on [D'Amato] on December 25, 2012." (*Id.* at ¶ 26, ECF No. 89-2 at ¶ 26.)

When the officers arrived at Olschafskie's house, she met them at the door and informed them that she was worried about D'Amato, gave them "a brief rundown of Tyler's day", and said she wanted him taken to the hospital for psychiatric evaluation. (ECF 95-1 at 44.) Olschafskie "advised [Officer Worden] that [D'Amato] had a previous brain injury and that this was a medical call[,] and we just wanted him transported to the hospital for observation. I stated five to ten times at least that he couldn't be jostled, he couldn't be handled roughly, he had left frontal lobe damage." (*Id.* at 42.) As the officers arrived, an ambulance also arrived at Olschafskie's house; the ambulance staff waited outside. (*Id.* at 43–44.) D'Amato was upset that his mother wanted him to go to the hospital for a psychological evaluation. (*Id.* at 47.) The officers told D'Amato that "they were there and they had to make sure h[e was] ok, they couldn't leave just because he said he was ok[.]" (*Id.* at 46.) D'Amato asked Olschafskie if she thought that he was a risk to himself. (*Id.*) She

3

"said that [she] did, [she] wanted him to be seen because [she] was worried about him, and he told [her] that he hated [her.]" (*Id.*; ECF No. 89-2 at ¶¶ 9–10.) D'Amato then became verbally belligerent, but "he wasn't irate or anything." (ECF Nos. 95-1 at 47–48, 89-2 at ¶ 7.) D'Amato and Officer Worden had previously had an encounter at a traffic stop; although Officer Worden had allowed him to go without a citation, Officer Worden had pulled a gun on him. (*Id.* at 51–52.) Olschafskie stated that this made D'Amato wary of Officer Worden on December 25, 2012. (*Id.* at 52.) After a few minutes, D'Amato agreed to go with the officers. (*Id.* at 48.) But he asked to have a cigarette first. (*Id.*)

D'Amato and the officers moved outside. (ECF Nos. 95-1 at 49, 89-2 at ¶ 11.) Once outside, D'Amato sat on a chair on the porch to smoke. (*Id.*; ECF No. 95-1 at 49.) Although the officers told her to stay inside, Olschafskie exited the house through the garage. (*Id.* at 52–53.) Once she exited the garage, she was standing "a few feet from D'Amato." (*Id.* at 53.) After a short time passed, the officers told D'Amato it was time to go. (*Id.* at 54.) D'Amato rose and began walking to the ambulance. (*Id.* at 54–55; ECF No. 89-2 at ¶ 13.) He had his cigarette in one hand and his cane in the other. (*Id.* at ¶ 14; 95-1 at 54.)

At this point, the plaintiff's and the defendants' versions of events diverge. The plaintiff states that D'Amato "only made it a couple of feet and then he dropped his cane." (ECF No. 95-1 at 55.) He said "I'm going to pick up my cane[.]" (*Id.*) "He bent over to pick up his cane, and he was tased." (*Id.* at 56.) The plaintiff stated that Officer Worden tased D'Amato, D'Amato fell to his knees, Officer Worden tased him again, and then "jumped on him." (*Id.* at 56–62.) Olschafskie further stated in her deposition that Officer Worden then put his knee on D'Amato's "upper back area, right below the neck." (*Id.* at 61.) Officer Worden "grabbed the back of [D'Amato]'s hair" and "proceeded to slam his head into the curb two or three times," such that his forehead struck

the curb (*Id.* at 61–62.) Olschafskie briefly turned away in horror and called 911 on her cellphone. (*Id.* at 62–64.) The officers then lifted D'Amato and carried him to the ambulance, and he was transported to St. Francis Hospital. (*Id.* at 64–68.) Olschafskie said that she could not see what injuries D'Amato had sustained because she "couldn't get close enough to him," "it was dark," and then he was taken away. (*Id.* at 65.)

The defendants offer a different version. According to them, D'Amato refused to put out his cigarette as the officers directed. (ECF No. 89-2 at ¶ 14; 89-5 at 2–3; 89-7 at 2–3.) They state that D'Amato then "bent down to grab his cane and . . . stood up rapidly and wielded the cane as if preparing to strike Officers Worden and Peterson[.]" (ECF No. 89-2 at ¶ 15.) Officer Worden tased D'Amato in the torso, incapacitating him. (*Id.* at ¶ 16.) They further claim that "Officers Worden and Peterson then attempted to gain control of [D'Amato]'s arms, but he resisted their efforts and concealed his right arm underneath his body on the ground." (*Id.* at ¶ 17.) Because "[D'Amato] refused several commands from Officers Peterson and Worden to put his right arm behind his back[] and continued to resist their efforts to secure it," Officer Worden tased D'Amato again. (*Id.* at ¶ 18.) Officer Worden then searched D'Amato and put him in handcuffs, and D'Amato was "placed on a stretcher by EMT's and transported by ambulance from the scene to St. Francis Hospital[,] pursuant to a Police Emergency Examination Request form prepared by Officer Peterson." (*Id.* at ¶¶ 21–22; 89–5 at 3, 89–8.)

Plaintiffs and defendants agree that D'Amato "was admitted to St. Francis at approximately 9:18 p.m. on December 25, 2012." (ECF Nos. 89-2 at ¶ 28, 96 at ¶ 28.) The medical report from St. Francis states that D'Amato had taser marks on his "left lower abdomen and left lumbar region." (ECF No. 89-13 at 3.) He also had an MRI that evening, and Olschafskie stated that doctors told her "they didn't see any additional bleeding on the brain[,] but there was a brain

injury." (ECF No. 95-3 at 69.) She stated that none of the doctors present "said anything to corroborate . . . or contradict" whether the December 25, 2012 incident had aggravated D'Amato's existing traumatic brain injury. (*Id.*) D'Amato also had a toxicology test that night, which tested positive for cocaine, marijuana, benzodiazepine, and opiates.[1] Although the EMS report from D'Amato's transport stated that he faked a seizure (ECF No. 89-10 at 2), later medical reports suggest that he in fact did experience a seizure that night. (ECF No. 95-23 at 4–5.)

On December 26, 2012, D'Amato was transferred "from St. Francis to the Mount Sinai Campus for involuntary psychiatric admission." (ECF Nos. 89-2 at ¶ 35, 89-15 at 11, 96 at ¶ 35.) On December 27, 2012, D'Amato "underwent a psychiatric evaluation by Dr. Muhammad Munawar." (ECF Nos. 89-2 at ¶ 36, 89-16, 95-23 at 4.) As a result of that evaluation, Dr. Munawar rated D'Amato a 30 on the 100-point Global Assessment of Functioning Scale and determined that his highest level of functioning in the past year had been a 51. (ECF Nos. 89-16 at 4; 95-18 at 21.)[2]

The plaintiff asserted in her complaint that, because of Officer Worden's actions, D'Amato's brain injury worsened and his mood changed. The plaintiff related in her deposition how D'Amato, previously a very cautious driver, began driving recklessly—even drinking and driving. (ECF No. 95-1 at 82–87.) She stated that he was "like three different people", referring to his personality before he was hit with the car in October 2012, his personality as he was recovering from that brain injury, and then his personality after the December 2012 incident. (ECF No. 95-1 at 92–93.)

---

[1] Plaintiff objects that this medical record is inadmissible as presented. (ECF No. 96 at ¶ 32.) But she fails to show that "the material cited to support . . . [this] fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

[2] The plaintiff objects to this fact. The objection is meritless, given that the same fact is found in plaintiff's own submission.

"On February 7, 2013, a motor vehicle [D'Amato] was driving in the parking lot of Holy Family Church in Enfield left the paved portion of the lot and struck a tree." (ECF Nos. 89-2 at ¶ 40, 96 at ¶ 40.) He was in the car with his cousins, Derek Chase and Michael [D'Amato]. (ECF No. 95-1 at 88.) Tyler D'Amato "sustained critical injuries in the accident and died as a result . . . on February 8, 2013[.]" (ECF Nos. 89-2 at ¶ 40, 96 at ¶ 40.) His cousins survived. (ECF No. 95-1 at 91.) "A medical examiner from the Chief Medical Examiner's Office determined [D'Amato's] cause of death to be multiple blunt traumatic injuries from the accident." (ECF Nos. 89-2 at ¶ 40, 89-18 at 11, 14–15, 96 at ¶ 40.) "As a result of [an] investigation, [Enfield Police Department] Officer [William] Vieweg determined that [D'Amato] was driving eighty-five (85) miles per hour at the time he lost control of the vehicle[.]" (ECF Nos. 89-2 at ¶¶ 42, 43, ECF No. 96 at ¶ 43.) The defendants submit that "[a]t the time Enfield police arrived at the scene of the accident, there was a strong odor of burnt marijuana emanating from [D'Amato's] vehicle." (ECF No. 89-2 at ¶ 41.)[3] Olschafskie states that she did not know anything about the drug use and that she did not believe that the crash was purposeful; she stated that D'Amato would not have deliberately crashed the car with his cousins inside. (ECF No. 95-1 at 93.)

Plaintiff's medical expert stated that "severe[,] common symptoms of traumatic brain injury were documented in the medical record from doctors and other medical staff, as well as [Olschafskie's] deposition." (ECF No. 95-9 at 17.) These included: dizziness, poor balance, headaches, visual problems, severe coordination problems, impaired concentration, poor judgment and insight, agitation, verbal outbursts, impaired self-control, irritability, mood changes, and risky

---

[3] The plaintiff asserts that this proof is immaterial within the meaning of Fed. R. Civ. Pr. 56(c). I disagree. The plaintiff has claimed that an exacerbation of D'Amato's existing traumatic brain injury led to his reckless driving and the fatal car crash. The defendants seek to present an alternate theory for the cause of the crash by introducing evidence of D'Amato's substance abuse. Therefore, this is a material fact.

behaviors. (*Id.*) Plaintiff's expert also stated that "the injuries caused by the violent actions of the Enfield police aggravated numerous symptoms of a preexisting traumatic brain injury[,] and thus the medical harm caused by the police was a substantial factor in causing Tyler D['A]mato's car crash and death." (*Id.* at 18.)

In support of her *Monell* claim, Olschafskie has also presented evidence regarding the Enfield Police Department's handling of excessive force claims. She has submitted evidence detailing several use of force complaints made against Officer Worden, both before and after the December 25, 2012 incident, and an Enfield Police Department Memo regarding Department uses of force. (*See* ECF Nos. 95-2,  95-10, 95-11, 95-12, 95-13, 95-14, 95-15, 95-16.) The plaintiff never filed a complaint with the Department regarding the December 25, 2012 incident. (ECF Nos. 89-2 at ¶ 56, 96 at ¶ 56.) She also did not notify the Town of Enfield about her allegations of misconduct until October 21, 2014. (ECF Nos. 89-2 at ¶ 57, 96 at ¶ 57.) Once the Department received notice of Olschafskie's claims, it investigated the incident. (ECF No. 89-2 at ¶ 58, 89-23, IA #2015-00, 96 at ¶ 58.) Lieutenant Curtis attempted to interview civilian witnesses who were present at the scene of the incident, but they were either unavailable or refused to cooperate. (ECF No. 89-23 at 9.)[4]

The defendants have submitted evidence that the officers involved and the EPD had undergone all necessary trainings and certifications: "As of December 25, 2012, the named defendant officers had received all of their state-mandated three year re-certification training"; "EPD was accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA)"; and "the EPD was also accredited by the Police Officer Standards and Training

---

[4] Plaintiff's claim that the facts regarding her notice to the Department and the Town are "irrelevant" and "immaterial" is also plainly meritless. The date of her notice to the Town is crucial to her indemnification claim. Further, the fact that she did not file a complaint, but that, once the Department had notice of her allegations, it conducted a thorough investigation of the incident is directly relevant to her *Monell*.

Council . . . the State of Connecticut's credentialing authority whose program is modeled after that of CALEA." (ECF No. 89-2 at 9–10.)

## II.     Standard of Review

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving parties—here, the officer defendants, the Town of Enfield, and Chief Sferrazza—bear the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (internal citations and alterations omitted).

If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The Court considers all facts "in the light most favorable to the nonmoving party"—here, the plaintiff—after drawing "all reasonable inferences in [her] favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000) (quotation marks omitted).

## III.    Analysis

### A.   Indemnification Claim

In Count Fourteen of her complaint, the plaintiff alleges that, under Connecticut General Statutes § 7-465, "Defendant Town of Enfield is legally liable to pay" any damages owed to the

plaintiff because of the defendant officers' and Chief Sferrazza's conduct. (ECF No. 1-1 at ¶ 58.) The Town of Enfield moves for summary judgment on this indemnification claim, arguing that it is untimely. I agree.

Conn. Gen. Stat. § 7-465(a) states that notice of any such claim must be given *within six months after such cause of action has accrued*. Olschafskie did not comply with the notice requirement. She does not dispute that she did not serve the Town with notice of her indemnification claim until October 21, 2014. (ECF No. 95 at 29.) Because that was nearly two years after the December 25, 2012 incident, this notice was clearly not within the six-month deadline of § 7-465. Therefore, I GRANT the motion for summary judgment on the claim for indemnification of the Town of Enfield.

### B.  Claims against Officer Yott

Next, Defendant Officer Yott has moved for summary judgment on all claims brought against her. (ECF No. 89-1 at 10.) The parties do not dispute that Officer Yott was "not present for, did not witness, and did not participate in any use of force on D'Amato on December 25, 2012." (ECF No. 89-2 at ¶ 26; ECF No. 96 at ¶ 26.) Because she was not present, she cannot be liable for any of the claims against her—all of which allegedly resulted from this incident. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). Therefore, I GRANT the motion for summary judgment on all claims against Officer Yott.

### C.  Unnamed officers

Counsel for the Town, Chief Sferrazza, and Officer Yott have also moved for summary judgment on all claims against the two unnamed defendants because they were not named, as required by Fed. R. Civ. P. 4(m), in a timely manner and because the applicable statute of limitations has run. (ECF No. 89-1 at 29.) In her opposition brief, Olschafskie states that "[t]he

10

Defendants have identified Officers Peterson and Taylor as the John and Jane Doe Defendants on the scene. Plaintiff seeks the Court's leave, pursuant to Fed. R. Civ. P. 15 to substitute them as party-defendants for their failure to intervene to prevent the constitutional violation." (ECF No. 95 at 33.) Olschafskie gives no explanation why she did not seek such leave earlier in the case and does not suggest that she made a mistake in failing to name Officers Peterson and Taylor as defendants earlier.

The failure to intervene claims against the unnamed defendants—counts eight and nine of the complaint—are subject to a three-year statute of limitations. Conn. Gen. Stat. § 52-577; *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) (holding that § 52-577 applies to § 1983 claims in Connecticut). Over three years have passed since December 25, 2012, so for Olschafskie to substitute Officers Peterson and Taylor, her amendment would need to relate back to the original date of filing under Fed. R. Civ. P. 15(c).

Fed. R. Civ. P. 15(c) allows amendments to relate back to the date of the original pleading in certain circumstances, thereby allowing the addition of a party even after the relevant statute of limitations has run. But this rule allows for amendments in the case of mistake: it "does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995), *modified*, 74 F.3d 1366 (2d Cir. 1996). "Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties (under certain circumstances), but the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Id.*

The plaintiff has not identified any mistake that would justify substituting Officers Peterson and Taylor under Rule 15(c) after the statute of limitations has run for the failure to intervene

claim. Although Olschafskie states in her response that "the Defendants have identified Officers Peterson and Taylor," she had notice that these officers were the ones present the night of the incident since at least November 2015 when defendants served compliance with the plaintiff's requests for production. (*See* ECF Nos. 60 at 2, 89-1 at 30.) Further, documents that the plaintiff herself filed reference Officers Peterson and Taylor's presence on the night of the incident. In Exhibit J to Olschafskie's response to the motion for summary judgment, one of the plaintiff's experts lists the "Taylor Incident Report" and the "Peterson Incident Report" as documents he considered in forming his opinions. (ECF No. 95-10 at 19.) In Exhibit Z, another of the plaintiff's expert's states: "Police officers responding to the call at 8:06 p.m. [on December 25, 2012] were Officer J. Peterson, A. Taylor and officer [sic] Worden." (ECF No. 95-23 at 2.) These references show that the plaintiff had sufficient notice regarding the identity of these officers, and so substitution under Rule 15(c) is not appropriate.[5]

Therefore, I DENY the plaintiff's request to substitute Officers Peterson and Taylor and GRANT summary judgment for the unnamed defendants on all counts against them. Thus, the only remaining officer defendant is Officer Worden.

   D. <u>Claim against officer defendants for negligence and negligent infliction of emotional distress and against the Town under Conn. Gen. Stat. § 52–557n</u>

Olschafskie has brought two claims of common law negligence against Officer Worden: count three alleges negligence and count six alleges negligent infliction of emotional distress. She also has brought a claim under Connecticut General Statutes § 52-557n alleging that the Town of Enfield is liable for Officer Worden's negligent conduct. At the same time, she charges Officer

---

[5] The plaintiff also fails to comply with an independent requirement of Rule 15(c): she fails to show that "within the period provided by Rule 4(m) for serving the summons and complaint" the two officers she now seeks to name "received such notice of the action that [he or she] will not be prejudiced in defending on the merits" and "knew or should have known that the action would have been brought against [him or her], but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C).

Worden with excessive use of force, intentional infliction of emotional distress, assault, and battery. (*Id.* at ¶¶ 36–40, 43–47, 51–52.) Officer Worden and the Town argue that, because these intent-based and negligence-based allegations rely on the same conduct, the plaintiff is not permitted to proceed to trial on both theories.

It is true that several courts in the District of Connecticut have held that "a plaintiff may not prevail on a negligence claim when he or she has brought claims of intentional use of excessive force and intentional infliction of emotional distress." *See, e.g.*, *Edwards v. City of Hartford*, No. 3:13–cv–878 (WWE), 2015 WL 7458501, at *4 (D. Conn Nov. 23, 2015); *Outlaw v. City of Hartford*, 3:07–cv–01769, 2015 WL 1538230, at *12 (D. Conn. Apr. 6, 2015) ("Courts in this circuit have generally held that where a plaintiff brings claims for excessive force and [intentional infliction of emotional distress], a negligence claim with respect to the same conduct will not lie[.]" (internal citations omitted) (citing cases); *Frappier v. City of Waterbury*, No. 3:07–cv–1457 (WWE), 2008 WL 4980362, at *4 (D. Conn. Nov. 20, 2008).

But other courts in this District have allowed negligence-based and intent-based claims regarding the same conduct to proceed to trial, which is consistent with federal pleading rules. *See Marsh v. Town of East Hartford*, No. 3:16–cv–928 (SRU), 2017 WL 3038305, at *7 (D. Conn. July 18, 2017); *Conroy v. Caron*, No. 3:14–cv–1180 (JAM), 2017 WL 3401250, at *18 (D. Conn. Aug. 8, 2017); *Bussolari v. City of Hartford*, No. 3:14–cv–00149 (JAM), 2016 WL 4272419, at *4 (D. Conn. Aug. 12, 2016); Fed. R. Civ. P. 8(d)(2), (3). In *Bussolari*, Judge Meyer considered the District of Connecticut cases that did not allow pleading both negligence and intent in excessive force claims:

> Those decisions cited above that have disallowed simultaneous intentional/negligent tort claims in this context have not elaborated on their reasoning other than to cite the fact of prior court rulings. They rely in part on cases applying New York law that appears to be different from Connecticut law. . . . By

contrast, it appears that Connecticut law allows for claims of negligence against police officers, including for negligent arrest and use of force. . . . Similarly, Connecticut courts have allowed for recovery under Connecticut's negligence-based municipal liability statute, Conn. Gen. Stat. § 52-577n, in cases involving allegations of excessive force by police officers. . . . Ultimately, I do not need to decide whether there is a distinction between the common law of New York and Connecticut. In view that defendants' argument here is simply that the negligence claims must fail because of their inconsistency with the intentional tort claims (rather than a claim that Connecticut law does not allow for negligence claims at all in the excessive force context), my principal concern is the baseline rule that a plaintiff is generally permitted to plead and prove his or her case on alternative and sometimes inconsistent theories of liability. I do not see why a special exception to this general rule should or must exist for claims of intentional and negligent police misconduct in the excessive force context.

*Bussolari*, 2016 WL 4272419, at *3–4 (internal citations and quotation marks omitted). Judge Meyer held that:

genuine fact issues remain to allow a jury to consider whether the defendant officers are liable for intentional torts or negligent torts. Furthermore, the record before me suggests that there are genuine issues of material fact that are properly left to a jury regarding how defendants—and plaintiff—acted during the arrest. It is best left upon a full trial record for a properly instructed jury to decide if plaintiff has established the elements of any of [their] claims, and if so, whether the facts presented suffice for a claim of a constitutional tort of excessive force and false arrest and/or some form of intentional or negligent tort under common law (provided, of course, that plaintiff may not obtain double recovery under alternative theories that are based on the same conduct and harm).

*Id.* at *4.

The situation here is precisely the same as in *Bussolari*: the defendants have argued for summary judgment on Olschafskie's negligence-based claims simply because they claim that the theories of negligence and intent are inconsistent. (ECF No. 89-1 at 11–12; 91-1 at 4–6.) I agree with Judge Meyer that it is best left to a jury, on a full trial record, to decide whether the plaintiffs have proved intentional and/or negligent conduct and that the rule against double recovery adequately protects the defendants from any resulting prejudice.

Therefore, I DENY Officer Worden's motion summary judgment on counts three and six and the Town's motion for summary judgment on count ten.

E.  Claim against Officer Worden for failure to intervene (under both § 1983 and Connecticut state law)

The plaintiff also brought both a federal and a state law claim for failure to intervene against the officer defendants. Counts eight and nine of the complaint both allege that "[a]lthough in a reasonable position to do so, some or all of the Defendant Enfield police officers failed to intervene to prevent and/or stop the unreasonable use of force on decedent Tyler D'Amato, by others, as described herein, thereby directly causing him physical, emotional[,] and economic injuries, as set for more particularly herein." (ECF No. 1-1 at ¶¶ 53, 55.) Again, the only remaining officer defendant is Officer Worden.

Because Officer Worden—the officer Olschafskie states was responsible for the tasing and the other alleged acts of excessive force—is the only officer defendant remaining in this suit, the plaintiff's failure to intervene claims fail as a matter of law. Olschafskie stated in her deposition that it was Officer Worden who tased D'Amato twice and banged his head on the curb, knowing that D'Amato had a brain injury. (ECF No. 95-1 at 57–62.) The plaintiff does not suggest that Officer Worden failed to intervene in his own actions; the plaintiff's testimony is that he was the officer responsible, not an on-looking officer. (*Id.*) Therefore, because I have dismissed the claims against the other officer defendants, I GRANT Officer Worden's motion for summary judgment on counts eight and nine of the complaint for failure to intervene under 42 U.S.C. § 1983 and Article I, §§ 7, 8, 9, and 20 of the Connecticut Constitution.

F.  Claim against Officer Worden and the Town for wrongful death

Count eleven of the complaint states a claim under Conn. Gen. Stat. § 52-555(a) against Officer Worden and the Town. (ECF No. 1–1 at ¶¶ 56–59.) § 52-555(a) permits a decedent's estate to recover for injuries resulting in death from "the party legally at fault for such injuries just

15

damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses[.]"

In a wrongful death action, "[t]he plaintiff must prove not only a violation of a standard of care as a wrongful act, but also a causal relationship between the injury and the resulting death." *Ward v. Greene*, 267 Conn. 539, 546 (2004). A wrongful death action "requires that the party seeking relief allege an underlying theory of legal fault and that such fault is the proximate cause of the injury." *Id.* at 547. The proximate cause determination asks "whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." *Paige v. Saint Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 25 (1999) (citations and internal quotation marks omitted).

The defendants argue that there is no genuine dispute as to proximate causation, because no reasonable juror could find that Worden's alleged conduct on December 25, 2012, was a substantial factor in D'Amato's car crash and death six weeks later. For a wrongful death to be proximately caused, however, it need not happen immediately or without any intervening negligence or recklessness, and Connecticut courts have been reluctant to remove causation issues from the trier of fact. *See, e.g.*, *Trzcinski v. Richey*, 190 Conn. 285, 295 (1983) ("The issue of proximate causation is ordinarily a question of fact for the trier . . . . it becomes a conclusion of law only when the mind of a fair and reasonable [person] could reach only one conclusion; if there is room for a reasonable disagreement the question is one to be determined by the trier as a matter of fact." (internal citations and quotation marks omitted)). In a case involving a suicide, the trial court denied a motion to strike (i.e., the analogue of a Rule 12(b)(6) motion in Connecticut state court), where a defendant's negligence in failing to mitigate paint fumes was alleged to have proximately caused the decedent's intellectual and neuropsychological damage that led her to take

16

her own life—some thirty-four months later. *Komjathy v. 146 Kings Highway*, *LLC*, No. CV020388947, 2005 WL 1331173, at *2–3 (Conn. Super. Ct. May 3, 2005). And, in a case where the plaintiff sought damages for injuries sustained after a high-speed chase with police ended in a car crash, the Connecticut Supreme Court held that "the intervention of negligent or even reckless behavior by [the plaintiff], does not under the emergent majority view, require the conclusion that there is a lack of proximate cause between the [defendant's] negligence and an innocent victim's injuries." *Tetro v. Town of Stratford*, 189 Conn. 601, 606–7 (1983). "The trial court was therefore not in error in permitting the jury to determine the question of proximate cause as a matter of fact," the Supreme Court continued, "despite the intervening negligence or recklessness of the driver[.]" *Id.* at 607.

The defendants argue that there is no triable issue because Officer Worden's actions were calculated to transport D'Amato to the hospital, thereby reducing the risk of suicide, rather than enhancing it. They assert that "[e]ven if plaintiff could somehow raise a genuine issue of fact as to whether some direct consequence of Officer Worden's use of force contributed, to some extremely tenuous degree, to D'Amato's reckless driving, she certainly cannot present a shred of evidence from which a reasonable juror could conclude that the resulting car accident was a 'foreseeable risk created by' Officer Worden's use of force." (ECF Nos. 89-1 at 14–15, 90 at 2.)

But Olschafskie counters that "Worden assaulted D'Amato twice with a [taser], and then viciously banged [his] head against a curb at least twice, knowing D'Amato suffered from a [traumatic brain injury], thereby aggravating his pre-existing condition" and that "D'Amato suffered numerous major post morbid behavioral changes resulting from Worden's assault," changes that "led directly to his death." (ECF No. 95 at 25.) Specifically, in her deposition,

Olschafskie testified that D'Amato's mental state changed noticeably and substantially after the December 25, 2012 incident:

> Q.    Now, apparently you're attributing this fatal motor vehicle accident to what occurred on December 25th, 2012, is that true?
> A.    Yes.
> Q.    What evidence do you have that anything that occurred on December 25th, 2012 led to this accident on February 7th, 2013?
> A.    I truly believe that I just know how my son was before any of this happened and I know how he was in the block of time between October and Christmas and I know how he was after that.  There were like three different people there. He was a happy kid, he loved me and made me laugh, and that kind of went away a little bit after the first accident, he was a little bit more reserved. He was looking forward to, I mean, every time he went to therapy he got better.  But he did have a brain injury, no doubt about it. But I truly believe when his head was hit, smashed on the ground a couple of times, that it made that brain injury worse.

 (ECF No. 95-1 at 92–93.) She also described increased recklessness in D'Amato's driving after the December 25, 2012 incident—conduct she described as "uncharacteristic of him." (ECF No. 95-1 at 82–83.)

The plaintiff's medical expert also concludes, based on the facts presented, that D'Amato's symptoms are consistent with aggravation of his earlier traumatic brain injury. (ECF No. 95-9 at 17–18.) The plaintiff's medical expert cited D'Amato's post-Christmas personality changes and increasingly reckless behavior as one of the bases for his opinion that "[w]ithin a reasonable degree of medical certainty (more likely than not) I conclude that the injuries caused by the violent actions of the Enfield police aggravated numerous symptoms of a preexisting traumatic brain injury and thus the medical harm caused by the police was a substantial factor in causing Tyler D['A]mato's car crash and death." (ECF No. 95-9 at 17–18.)[6]

---

[6] Defendants assert that the plaintiff's medical expert will not be allowed to testify at trial "about his far-fetched opinion that Worden's use of force was a 'substantial factor' (i.e., proximate cause) in causing the car accident," (ECF No. 97 at 8), but they offer no analysis to support this assertion. The sole case they cite—*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)—dealt with an expert who was opining as to the credibility of police officers, which the court found to be an issue in the exclusive province of the jury and as to which expert testimony would not assist the jury. 414 F.3d at 397–98. By contrast, here the plaintiff offers the opinion of a psychiatrist—who is board certified in psychiatry and neurology and whose qualifications  and methodology the defendants have not challenged—as to the

On this record, it is for a jury to decide whether D'Amato committed suicide or was driving recklessly because of a worsened brain injury proximately caused by Officer Worden's behavior. Therefore, the defendants' motion for summary judgment on the wrongful death claim is DENIED.

G.  Claim against the Town, Chief Sferrazza,[7] and Officer Worden for bystander emotional distress

Officer Worden, the Town, and Chief Sferrzza also move for summary judgment on the plaintiff's bystander emotional distress claim. Olschafskie alleges that "as mother of the Plaintiff's decedent, Tyler D'Amato, contemporaneously observed the negligent, reckless, deliberately indifferent and/or unconstitutional acts of some or all of the Defendant Enfield police officers herein, as set forth herein, which directly produced severe physical pain and suffering and sequelae to her son, Tyler D'Amato, . . . [and] which ultimately were a substantial factor in his death on February 8, 2013." (ECF No. 1-1 at ¶ 56.)

For a bystander emotional distress claim, Connecticut law is based on reasonable foreseeability and requires that (1) the bystander be "closely related to the injury victim"; (2) that the bystander's emotional injury "be caused by the contemporaneous sensory perception of the conduct that causes the injury"; (3) that the injury to the victim was "substantial resulting in either death or serious physical injury"; and (4) that the bystander "sustained a serious emotional injury." *Clohessy v. Bachelor*, 237 Conn. 31, 52–56 (1996) *holding modified on other ground by Squeo v. Norwalk Hosp. Ass'n*, 316 Conn. 558 (2015). The first, second, and fourth elements are not disputed. (*See* ECF No. 89-1 at 25–27.)

---

impact of head trauma on possible personality changes observed by fact witnesses. The defendants have made no attempt to show that such an opinion would not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and it is not clear that they could make such a showing. Further "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704.

[7] The plaintiff names Chief Sferrazza as a defendant on the bystander emotional distress claim. It is unclear on what basis Chief Sferrazza might be liable for this claim. However, the defendants did not raise the issue in their motion for summary judgment. (ECF No. 89–1 at 24–27.) As such, the claim will proceed against Chief Sferrazza.

As for the third element, Black's Law Dictionary defines "serious physical injury" as a "serious physical impairment of the human body; especially, bodily injury that creates a substantial risk of death or that causes serious, permanent disfigurement or protracted loss or impairment of the function of any body part or organ." (10th Ed. 2014.) On motions for summary judgment, Connecticut courts have found that (1) a finger laceration a child got from an Old Navy display table and (2) bruising and contusions resulting from a car accident, which required medical treatment and physical therapy, were not substantial injuries for purposes of a bystander emotional distress claim. *Conger v. Old Navy, LLC*, No. CV096000986, 2010 WL 5065255, at * 3–4 (Conn. Super. Ct. Nov. 23, 2010) (finger laceration); *Nelson v. Winkel*, No. CV030090872S, 2004 WL 2591886, at *2–3 (Conn. Super. Ct. Oct. 4, 2004) (automobile accident injuries). However, courts have permitted bystander claims where the bystander witnessed (1) the loss of an arm, (2) an injury causing contusions, back sprain, and mental and physical pain and suffering, and (3) an infant dropped on the floor. *See Hibner v. Bruening*, No. NHCV010456730S, 2009 WL 2782894, at *3 (Conn. Super. Ct. July 30, 2009) (collecting cases).

The defendants argue the undisputed facts establish that the injury Olschafskie witnessed was not substantial under *Clohessy*, pointing out that the plaintiff saw D'Amato in the hospital no more than an hour after the use of force, observed only "minor bruises and scratching" on his body, and was relieved when an MRI revealed no exacerbation of his brain injury." (ECF Nos. 89-1 at 25–27, 97 at 9.) But the defendants mistakenly focus on Olschafskie's lack of a perception of D'Amato's brain injury to argue that the injury was insubstantial. (ECF No. 89-1 at 26–27.) Under *Clohessy*, the plaintiff need only have witnessed the *conduct or event* that caused the substantial injury—the full effects of the injury do not need to be immediately perceptible. *See Sinapi v. Thomas*, No. CV126025922, 2013 WL 3215169, at *4–5 (Conn. Super. Ct. June 5, 2013)

(analyzing the temporal requirements of the second and third elements of *Clohessy* distinctly). Olschafskie did witness conduct that, according to Olschafskie's expert, allegedly caused a serious exacerbation of D'Amato's brain injury. (ECF No. 95-9 at 16–18.) Specifically, the plaintiff's medical expert stated that the medical records showed that D'Amato had a traumatic brain injury at the time of the incident and that the incident aggravated this injury.[8] (ECF No. 95-9 at 16–18.)

While D'Amato's bruises, abrasions, and taser marks probably would not be sufficient to establish a substantial injury, *see, e.g.*, *Nelson*, 2004 WL 2591886, at *2–3, the plaintiff has raised a genuine issue of material fact about the seriousness of the head trauma D'Amato suffered on December 25, 2012. Although the EMS report indicates that D'Amato "faked a seizure," and the initial hospital report of brain imaging does not report any exacerbation of his existing brain injury, (ECF No. 89 Exs. G & J), other medical records suggest that D'Amato did suffer a seizure because of the incident (ECF No. 95-23 at 4), and plaintiff's medical expert opined that the incident did exacerbate D'Amato's brain injury, causing dizziness, poor balance, visual problems, coordination problems, impaired concentration and judgment, impaired self-control, mood changes, and increased risky behaviors. (ECF No. 95-9 at 17); *c.f. Constantino ex rel. Constantino v. Avery Center for Obstetrics and Gynecology, P.C.*, 32 F. Supp. 2d 506, 507–8 (D. Conn. 1998) (denying a motion in limine, seeking to exclude a claim for bystander emotional distress, because the

---

[8] In her complaint, Olschafskie also linked D'Amato's death to the bystander emotional distress claim (ECF No. 1–1 at ¶ 57), but in her opposition brief, she does *not* argue that D'Amato's eventual death in the car is a basis for this claim. (ECF No. 95 at 32–33.) The defendants addressed this argument in their memorandum of law supporting their motion for summary judgment: "Moreover, to the extent the plaintiff[] seeks to recover on this claim based on the fatal injuries [D'Amato] suffered as a result of the car accident on February 7, 2013, she cannot do so . . . [P]laintiff cannot recover damages for bystander emotional distress unless she contemporaneously perceived 'the event or conduct that causes the injury.' *Clohessy*, 237 Conn at 51." (ECF No. 89–1 at 27.) Because the plaintiff does not address this argument in her opposition brief, the Court deems this theory abandoned and will limit its analysis to whether there is a material fact in dispute regarding whether D'Amato's injury *at the time of the December 25, 2012* incident was a substantial injury under *Clohessy*. *See Hudson v. Babilonia*, 192 F. Supp. 3d 274, 290 (D. Conn. 2016) (considering claims abandoned where the plaintiffs did not address the defendants' argument regarding lack of subject matter jurisdiction in their opposition brief).

plaintiff father had witnessed a doctor failing to catch his baby being born, and the baby "suffered trauma to his head, a head laceration and, *resultingly*, cerebral palsy, developmental delay, impairment of visual special perception, body awareness[,] and bilateral coordination[]") (emphasis added).

Viewing this dispute in the light most favorable to the non-moving party, a reasonable jury could find that, as a result of the alleged assault by Worden that Olschafskie witnessed, D'Amato suffered a head trauma that resulted in a seizure and exacerbated his existing brain injury—thereby creating a substantial risk of death. As such, I DENY the defendants' motion for summary judgment on the plaintiff's bystander emotional distress claim.

### H. *Monell* claim against the Town and Chief Sferrazza

Count Twelve of the plaintiff's complaint states a claim against the Town and Chief Sferazza for an inadequate policy or custom under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978) held that respondeat superior is not a basis for municipal liability under § 1983. *See Reynolds v. Giulianai*, 506 F.3d 183, 191 (2d Cir. 2007). Instead, to hold a municipality or policymaking official liable under Section 1983, a plaintiff must establish "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

"Courts have recognized four ways for plaintiffs to demonstrate a 'policy or custom': (1) 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers'[]; (2) conduct ordered by a municipal official with policymaking authority[]; (3) actions taken 'pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels'[]; or (4) a 'failure to train'

municipal employees that 'amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact[.]" *Walker v. City of N.Y.*, No. 12 CIV. 5902 PAC, 2014 WL 1259618, at *2 (S.D.N.Y. Mar. 18, 2014) (quoting *Monell*, 436 U.S. at 690–91; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484–84 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); and *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). The plaintiff here relies only on the third way—custom.[9] Specifically, she asserts that the Enfield Police Department had a custom of deliberate indifference in its "supervision, investigation, and disciplining of its officers[.]" (ECF No. 95 at 6–8.)

"To prove . . . deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violation; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* (internal citations omitted). Deliberate indifference may arise where the plaintiff comes forward with "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). But where "the record shows that a complaint process existed and that the filing of a complaint usually triggered an investigation in which statements from complainants were taken" and "[i]n the absence of evidence that the investigations or results were improper,

---

[9] In her complaint, the plaintiff also alleged a *Monell* violation based on a failure to train. (ECF No. 1–1 at ¶¶ 61–62.) In her opposition to the motion for summary judgment, though, she does not mention the failure to train theory, even though the defendants briefed the issue. As such, that allegation is deemed abandoned. *See Hudson v. Babilonia*, 192 F. Supp. 3d 274, 290 (D. Conn. 2016) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (internal citations and quotation marks omitted)).

*Monell* liability cannot be established . . . based on a theory of failure to supervise or discipline." *Cosentino v. Town of Hamden*, No. 3:11–CV–1669 RNC, 2014 WL 1305148, at *3 (D. Conn. Mar. 31, 2014).

The plaintiff relies on evidence of prior complaints against Officer Worden and on the opinions of Chief Charles Drago, a career law enforcement officer and plaintiff's expert witness on police practices. Chief Drago opines that Chief Sferrazza's actions amounted to a *Monell* violation because: (1) the Department's use-of-force reports were cursory and incomplete; (2) the Department's review of these reports also was cursory and amounted to "rubber stamping"; (3) the Town and the Chief have a reactive practice of opening an investigation only when there is a complaint or lawsuit; and (4) the Town and the Chief presided over a culture in which police officers never reported other officers' misconduct. (ECF No. 95-10 at 9, 13, 16); *see Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 323 (2d Cir. 1986) (stating that expert testimony is admissible evidence a jury may consider on a *Monell* claim).[10]

The plaintiff's assertion that a substantial number of complaints against Officer Worden were made before the December 25, 2012 incident (ECF No. 95 at 13–14)—and Chief Drago's related opinion that Worden's complaint history "far exceed[ed] that of the typical and reasonable officer" and thus demanded "closer scrutiny" (ECF No. 95-10 at 10)—do not establish deliberate indifference. The plaintiff submitted a memo dated January 8, 2013, addressed to Chief Sferrazza from Deputy Chief Gary Collins, which summarizes Collins' "review of all Internal Affairs investigations involving Off. Matthew Worden." ("Collins memo," ECF No. 95-2 at 1.) The

---

[10] Drago also offers other opinions not pertinent to the *Monell* claim. For example, he opines that the Town and the Chief failed to conduct a proper investigation into the use of force against Tyler D'Amato following the December 25, 2012 incident. If so, however, that failure would not have caused the violation of D'Amato's constitutional rights. *See Wray*, 490 F.3d at 195 (requiring proof that the policy or custom "cause the plaintiff to be subjected to" a denial of a constitutional right). The same can be said about complaints concerning Officer Worden—and allegedly inadequate investigations of those complaints—occurring after the December 25, 2012 incident.

Collins memo, which summarizes thirteen internal affairs cases, from 2007 through 2013, involving Officer Worden and describes how each was resolved, undermines the plaintiff's argument that the Town or the Chief was deliberately indifferent. The memo shows: (1) that each complaint was investigated; (2) that the clear majority were found unsubstantiated; (3) that all four excessive force complaints were found unsubstantiated; and (4) that Officer Worden was disciplined in the two instances in which complaints were substantiated (one involving an off-duty altercation with Officer Worden's girlfriend five years before the D'Amato incident and the other involving an incident over four years before the D'Amato incident in which Worden increased the penalty for a parking violation from a warning to a ticket after the violator argued with him). (ECF No. 95-2 at 2–5.) This discipline consisted of a counseling session "for his decision to change from a verbal warning to an infraction" and a sixty-day suspension for the off-duty altercation. (*Id.* at 2–3.) Again, neither of these incidents involved excessive force. Therefore, even if, as Drago opines, the number of complaints against Officer Worden called for close scrutiny of his behavior by Chief Sferrazza and the Town, the Collins report suggests that he received that scrutiny—both in the sense that each incident was investigated and in the sense that a comprehensive review of his complaint history was performed. Nothing in the Collins memo suggests that the Chief or the Town was deliberately indifferent to uses of excessive force. With no excessive use of force complaints substantiated against Worden, neither the Chief nor the Town was on notice that Officer Worden might be likely to use force improperly in the future.

And to the extent the preparation of the Collins memo itself is relevant to the *Monell* claim,[11] it tends to show that the Chief and the Town were not deliberately indifferent to the pattern

---

[11] Although it was created after the December 25, 2012 incident, it might be admissible to the extent it was probative of the Chief's or the Town's supervisory practices before the incident. I do not, however, decide admissibility at this time.

of complaints against Officer Worden. The Chief was concerned enough that he commissioned the memo and ultimately sent Officer Worden for further training. (ECF No. 95-2 at 5.) Moreover, the memo recommended further training not because of any finding that Worden was engaging in excessive force, but instead because of a discerned weakness on his part in dealing with difficult people, which the extra training was meant to remedy. (*Id.*) The memo concludes as follows:

> there remains a concern as to the sheer number of complaints as well as the common thread of rude/discourteous b[e]havior. . . In fairness to Off. Worden, some of these individuals making the complaints were difficult and have a history of contacts with other officers in the department. . . . My recommendations are to locate training for Off. Worden that would assist him in dealing with difficult people. In addition, extra supervision on his calls may help to stem some of these complaints. The shift commanders and field sergeants need to get more involved with Off. Worden on a daily basis. I believe frequent reminders of what this department expects from its officers is vital in this case.

(*Id.*) In short, to the extent the preparation of the memo is relevant, it suggests that the Chief and EPD leadership were taking steps to address Worden's flaws as an officer; and it certainly does not suggest the Chief or the Town was deliberately indifferent to the use of excessive force.

As for the opinions of Chief Drago, they also do not amount to evidence from which a reasonable juror could find deliberate indifference within the meaning of the case law. Drago does not suggest that EPD officers, under the direction of Chief Sferrazza, failed to prepare use-of-force incident reports. Instead, he opines that these reports were "generally vague and failed to provide all the information necessary for a supervisor to approve the force used in the incident." (ECF No. 95-10 at 9.) The opinion that the reports are insufficiently detailed does not suggest that the Chief was deliberately indifferent to complaints of excessive force. Similarly, Drago does not suggest that the Department failed to review the use-of-force reports that were submitted. Instead, he states that that review was cursory: that "the review [was] just a rubber stamp[,] and the department doesn't investigate these uses of force unless they receive a citizen complaint or receive notice of

26

a civil action." (*Id.* at 13.) The failure to adopt a policy of proactively investigating every time a use of force incident is reported by an officer is not tantamount to adopting a custom or practice of tolerating excessive force.[12]   The evidence suggests EPD officers were properly trained and prepared reports, and that those reports were reviewed. Even if the reporting was insufficiently detailed and the review insufficiently thorough, in the absence of complaints or other signs that excessive force was actually being used, suboptimal reporting and review of force incidents do not amount to deliberate indifference.

Further, the Collins memo undermines any suggestion that the Town and the Chief failed to make "any meaningful investigation" into use-of-force incidents, either by conducting no investigation or by conducting investigations that were patently one-sided. *See Ricciuti*, 941 F.2d at 123; *see also Fiacco*, 783 F.2d at 330–31. The Collins memo shows that there were investigations, and there is no evidence that they were one-sided. Even Drago does not suggest that these investigations were inadequate in the sense that, for example, key witnesses were not interviewed. (*See* ECF Nos. 95 at 14–15, 95-10 at 9.) Instead, he says the investigations were inadequate simply because they did not substantiate the allegations made by the complainant. (*Id.*) And in the only investigation documented in the record—the investigation of D'Amato's treatment (which, to the extent it was inadequate, could not have caused the violation of D'Amato's constitutional rights because it occurred after any potential violation)—the EPD internal affairs investigator made several attempts to interview family members, only to have them refuse to cooperate. (ECF No. 89-23 at 9.) To the extent that report is indicative of how the EPD conducts its investigations, it does not suggest that the investigatory process was inadequate.

---

[12] Similarly, while the plaintiff's expert says that the Chief should have been proactive and not waited for a complaint before an investigation is undertaken (ECF No. 95–10 at 11), the failure to adopt optimal practices does not equal deliberate indifference, at least in the absence of evidence that the failure to be proactive is leading to the violation of constitutional rights.

Two of my colleagues have rejected virtually identically deliberate indifference claims made against the Town of Enfield and Chief Sferazza based on virtually identical evidence. *See McAlmond v. Town of Enfield, et al.*, No. 3:15cv158(JAM), ECF No. 87 at 35–36; *Demski v. Town of Enfield, et al.*, No. 3:14cv01568(VAB), ECF No. 85 at 5–14. In both cases, the plaintiffs alleged that the Town and Chief Sferazza were liable under *Monell* because the Enfield Police Department did not adequately investigate civilian claims against Officer Worden and other officers. Both plaintiffs also alleged that the Department tolerated false and bare-bones incident reports as a method to protect officers. Both plaintiffs further sought to admit evidence regarding prior unsubstantiated complaints and evidence of incidents that happened *after* the uses of force leading to their claims; these incidents are the same incidents that the plaintiff cites as evidence in this case.[13] Also in both cases, the plaintiffs sought to bolster their claims with a report by the same police practices expert Olschafskie retained, Chief Drago, which detailed his opinions about the Department's indifference to false reporting. *Demski*, No. 3:14–cv–01568(VAB), ECF No. 73-37; *McAlmond*, 3:15–cv–158(JAM), ECF No. 66-6.

I agree with Judges Bolden and Meyer that this factual record does not present a triable issue of material fact on the plaintiff's *Monell* claim. As in the cases before them, most of the incidents the plaintiff cites as evidence that the Chief and the Town had notice of unconstitutional conduct happened *after* the December 25, 2012 incident. (ECF Nos. 95 at 14–20) And, as shown, to the extent that the incidents happened before the incident, the evidence indicates that the Chief and the EPD took these complaints seriously and investigated the allegations. (ECF Nos. 95-2, 95-24.) They did the same for Olschafskie's claim, once they had notice. (ECF Nos. 89-2 at ¶ 58, 89-

---

[13] In *Demski*, the facts of Olschafskie's case are referenced as one of these incidents. *Demski*, No. 3:14cv01568(VAB), ECF No. 85 at 9.

23, IA #2015-00, 96 at ¶ 58.) The sheer number of complaints does not establish a triable issue of fact on the plaintiff's deliberate indifference claim.

> As Judge Bolden wrote:
>
> According to Mr. Demski, the EPD was aware that officers used force on civilians on more than a dozen occasions before Mr. Demski's arrest. He claims that these use-of-force incidents gave notice to the Town and to Chief Sferrazza that EPD officers inappropriately: kicked and pushed a woman during an arrest; punched college students during an arrest; attacked arrestees and fleeing suspects with police canine units on multiple occasions; and deployed a taser gun on an individual while escorting him to an ambulance for psychiatric care. In each of the reported use-of-force incidents, EPD officers prepared detailed reports describing the circumstances surrounding the use of force, the EPD reviewed those reports internally, and the EPD approved the use of force. Although none of these incidents has been found to constitute a constitutional violation in a court of law, Mr. Demski contends that, taken together, these incidents gave the Town and Chief Sferrazza "obvious red flags that abuses were occurring," putting the municipality on notice that the EPD had serious problems with excessive force. . . .
>
> Here, however, there is no evidence in the record suggesting that the reported incidents constitute a pattern of excessive force on the part of EPD officers. The cited use-of-force reports were not formal civilian complaints. Instead, police officers, themselves, not individuals accusing police officers of misconduct, filed each of the referenced use-of-force reports. . . . Furthermore, neither Chief Sferrazza nor the Town was directly involved in any of the reviews of the listed use-of-force reports, and none of the police officers identified in those incidents was named as a Defendant in this action. Contrary to Mr. Demski's assertions that the reported incidents presented Chief Sferrazza and the Town with "obvious red flags," these reported incidents do not suggest a pattern of constitutional violations, nor do they suggest the requisite notice on the part of the municipality that the EPD had any problems with excessive force. Thus, Mr. Demski cannot establish that the Town and Chief Sferrazza were deliberately indifferent for purposes of Monell liability.

*Demski*, No. 3:14–cv–1568 (VAB), ECF No. 85 at 9–11. And, as Judge Meyer stated:

> I conclude here that I don't have a triable issue of fact on plaintiff's *Monell* claim . . . First of all, there's been no evidence here of personal involvement by the police chief, chief policymaker for the police department.
>
> Second, although plaintiff does rely primarily on news accounts of Officer Worden's allegedly violent conduct dating back to 2007, I conclude that that incident, especially a domestic violence incident in which he was subject to redress by the department and in light of its number of years before the incident in question,

here close to five years before, that the probative evidence of that itself is quite slight; especially in view that he was subject to departmental sanction on account of that.

Plaintiff also cites a large number, I think more than 30, use-of-force reports that were submitted and alleges that the department's review and approval of these reports was deficient. I have to say that although it does not appear that the department's documentation here was very substantial, I'm not convinced that the fact of just the number of use-of-force reports themselves are indicative that force was improperly used in such instances. And facts far more likely to be indicative, in my view, of the municipality's responsibility for police officers' unconstitutional use of force would be if no reports were filed in the first instance at all and the municipality failed to inquire at all into the failure to file such reports. And that's simply not what we have here. And it is undisputed, and I place significant weight on the fact that each of the officers here was up to date on their training obligations as required under the law.

Plaintiff also relies on the fact that there have been numerous other complaints of misconduct by one or more, by Worden and other town police officers. This is something I asked a lot about at argument. None of these claims have been substantiated, and few of them have been the subject of complaint prior to March 2012, most of them, drawing upon the Collins memo, involving not claims of unreasonable use of force here, I think by all accounts two such claims of use of force, including rude and discourteous behavior, which is certainly not flattering to the police department, but that's different in my view in terms of the police department's obligation and notice as to whether they have been deliberately indifferent with respect to these complaints. So I'm not persuaded by the fact the numerosity of the complaints, in large part because of the lack of substantiation, the few that occurred prior to this incident in March of 2012, and that just the sheer numerosity of reports creates a genuine fact issue that the department has acted deliberately indifferently.

In my view, there's a basic lack of predicate here that the Town and the police department should have been aware of a special concern at the time in March 2012 about Worden and the other officers and that such special concerns could have been remediated here by better supervision and training.

And I also conclude that there's a lack of a jury issue on the issue of causation, how that would have caused and stopped the alleged constitutional violation at issue in this particular case.

*McAlmond*, 15–cv–158 (JAM), ECF No. 87 at 32–36.

Because the record shows that the Chief and the Town investigated complaints against

Worden, found all but two non-force complaints unsubstantiated, imposed discipline for the

substantiated complaints, undertook a thorough review of his conduct in January 2013, and attempted to conduct a balanced investigation of Olschafskie's complaint, the plaintiff has failed to show that any dispute regarding a material fact remains on her *Monell* claim. Therefore, I GRANT the Town and Chief Sferrazza's motion for summary judgment on the plaintiff's *Monell* claim.

## IV.    Conclusion

For the reasons stated, I GRANT the motion for summary judgment for (1) all claims against Officer Yott; (2) the claims against the unidentified officer defendants; (3) the failure to intervene claims under both state and federal law against all officer defendants; and (4) the plaintiff's *Monell* claim against the Town and Chief Sferrazza. The claims that remain for a jury to decide are: (1) § 1983 excessive force against Officer Worden; (2) excessive force under Connecticut law against Officer Worden; (3) negligence by Officer Worden under state law; (4) reckless or willful conduct by Officer Worden; (5) intentional infliction of emotional distress by Officer Worden; (6) negligent infliction of emotional distress by Officer Worden; (7) assault and battery by Officer Worden; (8) negligence against the Town under § 52–557n; (9) wrongful death against Officer Worden and the Town; and (10) bystander emotional distress against Officer Worden, the Town, and Chief Sferrazza.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
             September 27, 2017

31